IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Wiley Y. Daniel**

Civil Action No.  06-cv-01343-WYD-CBS

KIMBERLY ADAIR,

      Plaintiff,

v.

EL PUEBLO BOYS' & GIRLS' RANCH, INC. LONG TERM DISABILITY PLAN,

      Defendant.
_____

**ORDER**
_____

I.    <u>INTRODUCTION</u>

      THIS MATTER came before the Court on a hearing on Wednesday, March 5, 2008.  I heard argument at the hearing on Defendant's Motion for Judgment on the Administrative Record, Plaintiff's Motion for Judgment on the Pleadings, and Plaintiff's Objection and Motion to Strike Exhibit A of Defendant's Motion for Judgment on the Administrative Record.  I also allowed further briefing, which has now been filed.

      For the reasons stated below, Plaintiff's Motion for Judgment on the Pleadings is denied.  Plaintiff's Objection and Motion to Strike Exhibit A of Defendant's Motion for Judgment on the Administrative Record is overruled as to the objection and denied as to the motion.  Defendant's Motion for Judgment on the Administrative Record is also denied, and this case is remanded to the Plan Administrator for further fact finding consistent with this Order.

II.     <u>BACKGROUND</u>

Plaintiff began her employment as director of human resources at the El Pueblo Boys' & Girls' Ranch on June 18, 2001.  El Pueblo Boys' & Girls' Ranch Long Term Disability Plan ["the Plan"] is the name of the employee benefit plan under which she is entitled to benefits.

Plaintiff alleges that she is, and was at all time relevant hereto, a participant and beneficiary of the Plan.  She further alleges that she has been disabled under the Plan's definition since October 1, 2002, as she has remained completely unable to perform the material duties of her regular job as well as the material duties of any gainful job for which she is reasonably fit by training, education or experience.  This is as a result of her diagnosis of fibromyalgia and other ailments.  Plaintiff's last day of work at El Pueblo Boys' & Girls' Ranch was September 30, 2002.

Plaintiff filed an application for long term disability ["LTD"] benefits on or about December 9, 2002.  Pursuant to the Plan, this was submitted to United States Life Insurance Company ["United States Life"], the entity that issued the disability policy for her employer.  Defendant asserts that the application was received and analyzed by Disability Reinsurance Management Services, Inc. ["DRMS"], the entity Defendant asserts was charged with claims administration on behalf of the insurer.

Plaintiff filed her Attending Physician's Statement with the Plan supporting her disability on or about January 8, 2003.[1]  Plaintiff asserts that the Plan contains a 90-

---

[1]  The medical and other evidence is discussed in detail below in connection with Defendant's Motion for Judgment on the Pleadings.

day waiting period between the onset of total disability and eligibility for long term disability benefit payments. Plaintiff filed a proof of loss with United States Life within 90 days after the waiting period as required by the Plan. Under the terms of the Plan and the insurance contract incorporated within it, Plaintiff asserts that as of January 1, 2003, she was entitled to a monthly disability benefit in the amount of $2,272.50.

On March 14, 2003, DRMS denied Plaintiff's request for disability benefits. Plaintiff received this letter on or about March 19, 2003. The denial was based on Plaintiff's fibromyalgia diagnosis, citing the absence of any objective basis for her complaints, the lack of medical evidence of or specifics regarding limitations on her abilities, and the absence of any psychiatric treatment which would be expected in the case of a Class 5 impairment. The March 2003 letter informed Plaintiff that DRMS was the "claims administrator" for her LTD claim and that it was denying her application for LTD benefits. The letter did not state that the Plan Administrator had denied Plaintiff's claim for benefits.

Plaintiff argues that the Plan Administrator never made a determination of her eligibility for LTD benefits under the Plan. Indeed, she asserts that as the Plan does not name a Plan Administrator, by operation of law, El Pueblo Boys' and Girls' Ranch is the Plan Administrator. The Plan does not give the Plan Administrator authority to delegate the duty or ability to make benefit determinations. Without such authorized delegated authority, Plaintiff argues that no one other than the Plan Administrator has the power to make benefit determinations.

On June 25, 2003, Plaintiff filed a written appeal of DRMS's denial of benefits in keeping with the appeal procedures stated in the March 19, 2003 letter. On October 14, 2003, DRMS notified Plaintiff regarding her appeal. DRMS admitted Plaintiff's diagnosis of fibromyalgia but denied that the medical evidence supported a finding of disability, and noted that disability status was inconsistent with the medical reviews of Plaintiff's records, the results of the functional capacity evaluation ["FCE"], and surveillance reports on Plaintiff.

On January 8, 2004, DRMS wrote a letter affirming the denial of LTD disability benefits, finding no physical disability and no basis for evaluating a psychiatric disability. The letter from DRMS stated that it had determined that its original decision to deny benefits was appropriate. Plaintiff asserts that the March 14, 2003 letter failed to identify any Plan provisions supporting the denial of benefits. Instead, the letter based the denial on an unsupported assertion that Plaintiff's providers could not identify any objective basis for Plaintiff's pain. However, it is argued that the Plan does not require any objective basis for a diagnosis in order to be considered disabled.

Plaintiff asserts that Defendant's handling of Plaintiff's claim for LTD benefits was regulated by ERISA statutory and regulatory requirements. She alleges that Defendant failed to comply with the requirements of ERISA in denying Plaintiff's benefits and, therefore, Plaintiff is entitled to benefits under the Plan pursuant to 29 C.F.R. § 1132(a)(2)(b). Specifically, she asserts that she has remained continuously disabled under the terms of the Plan from October 1, 2002 to the present and is entitled to monthly benefits in the amount of $2,272.50 from January 1, 2003 forward.

Further, she alleges that Defendant's handling of Plaintiff's claim violated applicable federal statutes and regulations. These violations include the fact that (1) Defendant failed to conduct a full and fair review of Plaintiff's claim for LTD benefits; (2) Defendant failed to conduct a reasonable review of Plaintiff's claim; (3) Defendant's denial of Plaintiff's claim was arbitrary and capricious; (4) Defendant failed to comply with the requirements of 29 C.F.R. § 2560.503-1; (5) the Plan Administrator did not provide Plaintiff with notification of an adverse benefit determination; and (6) the Plan failed to establish or follow claims procedures consistent with the requirements of 29 CFR § 2560.503-1. Plaintiff seeks the benefits due under the Plan.

I previously denied a motion filed by Plaintiff to strike Defendant's Motion for Judgment on the Administrative Record. In that Order of September 21, 2007, I noted that even where de novo review is sought in an ERISA case, the review is generally addressed on the administrative record. *Id.* at 2. I further noted that courts routinely decide ERISA cases on motions for judgment on the administrative record. *Id.*

As to Plaintiff's argument that she should be permitted to supplement the record through additional evidence, I held that Plaintiff had not shown circumstances which establish that additional evidence is necessary, or presented any additional evidence to the Court that she believes must be considered. *Id.* at 3. Absent such a showing, I held that Defendant's motion was properly before the Court. *Id.* I also held that if Plaintiff believes there are circumstances that would warrant consideration of evidence beyond the administrative record, she can raise this in her response to Defendant's

motion. *Id.* Finally, I rejected the argument that Plaintiff is entitled to a jury trial, and that such right precludes consideration of Defendant's motion. *Id.* at 3-4.

After entry of this Order, Plaintiff filed a Motion to Set the Matter for Trial to the Court and to Terminate Briefing Regarding Defendant's Motion for Judgment on the Administrative Record. That motion was denied by Order filed October 12, 2007. I now turn to the merits of this case.

III. ANALYSIS

    A. Plaintiff's Motion for Judgment on the Pleadings (converted to a Motion for Summary Judgment by Minute Order of January 14, 2008)

Plaintiff's motion argues that judgment on the pleadings is proper because Defendant's Answer establishes that the Plan failed to establish and follow reasonable claims procedure as required by 29 C.F.R. § 2560.503-1. Specifically, the Complaint alleges that "The Plan failed to establish or follow claims procedures consistent with the requirements of 29 CFR § 2560.503-1." Compl. ¶ 41. The Answer "denies the allegations in Paragraph 41 of the Complaint" and states, "Further, the Plan affirmatively states that it did not establish or follow any claims procedures." Answer of Def. El Pueblo Boys' & Girls' Ranch Long Term Disability Plan to Compl. and Jury Demand, ¶ 41. Also, in response to the Complaint's allegation in ¶ 33 that "Defendant failed to conduct a full and fair review of Ms. Adair's claim for LTD benefits", the Answer denies the allegations and states, "Further, the Plan affirmatively states that it did not conduct a review of Plaintiff's claim for benefits." *Id.*, ¶ 33.

Plaintiff argues that the statements that the Plan did not establish or follow any claims procedures and that the Plan did not conduct a review of Plaintiff's claim for

benefits requires a decision as a matter of law granting judgment in favor of Plaintiff's claim for benefits. Accordingly, Plaintiff asserts that she is entitled to all of the remedies sought in her Complaint including (1) an Order directing the Plan to issue a lump sum payment for back benefits from January 1, 2003 to present, plus interest; (2) an Order directing the Plan to immediately begin making monthly benefit payments to Plaintiff for as long as she remains disabled under the terms of the Plan; (3) an Order enjoining the

Plan and all those working on its behalf from any future violations of 29 U.S.C. § 2560.503-1; and 4) an Order awarding Plaintiff's attorney fees and costs.

In response, Defendant notes that while Plaintiff refers to "the Plan" as a wrongdoer, the Plan is simply the name for a collection of benefits and has no ability to act. The Administrator of the Plan is Plaintiff's former employer, El Pueblo Boys' & Girls' Ranch, which retained an insurer to fund and administer claims for disability benefits by its employees. Therefore, in its Answer, Defendant properly denied that the Plan *per se* processed or denied Plaintiff's benefits claim.

Indeed, it is argued that Plaintiff properly submitted her proof of claim form to United States Life, as required by the Plan. United States Life retained DRMS to evaluate disability claims for the Plan. Defendant asserts that DRMS had claims procedures which Plaintiff followed and which resulted in the denial of Plaintiff's claim. Accordingly, Defendant argues that Plaintiff's motion should be denied.

Turning to my analysis, a motion for judgment on the pleadings pursuant to FED. R. CIV. P. 12(c) is treated as a motion to dismiss under Fed. R. Civ. P. 12(b)(6).

*Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1160 (10th Cir. 2000).  However, since the motion for judgment on the pleadings attaches materials outside the pleadings, it was converted to a motion for summary judgment pursuant to Fed. R. Civ. P. 12(d).

Summary judgment may be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the ... moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  In reviewing a summary judgment motion, the court must view the evidence in the light most favorable to the nonmoving party.  *Anaya v. Crossroads Managed Care Systems, Inc.*, 195 F.3d 584, 590 (10th Cir. 1999).  All doubts must be resolved in favor of the existence of triable issues of fact. *Boren v. Southwestern Bell Tel. Co.*, 933 F.2d 891, 892 (10th Cir. 1991).

Turning to my analysis, ERISA requires that the employee benefit plan establish and maintain reasonable claim procedures.  29 C.F.R. § 2560.503-1(b). The Answer is confusing as to whether the Plan in this case established and followed reasonable claim procedures as required by § 2560.503-1.  It first denied the allegation that the Plan failed to establish or follow the claim procedures required by that regulation, but then went on to "affirmatively state that it did not establish or follow any claim procedures.  Answer, ¶ 41.  Defendant clarifies this answer by stating that it meant to deny that the "disability plan," which is really just a term describing the set of benefits, was itself an actor in this matter, either in creating procedures or in rendering a decision on Plaintiff's claim.  Defendant asserts that the thrust of these denials was to

clarify the identity of the parties and focus on the actors, not the plan *per se* as defined by ERISA.

Turning to my analysis, the regulation clearly requires that the Plan itself establish the procedures, *i.e.*, "Every employee benefit plan shall establish and maintain reasonable procedures. . . . " 29 C.F.R. § 2560.503-1(b). It appears from the Answer and the evidence in this case that the Plan did not establish or maintain claim procedures as required by the regulation. Thus, it is certainly arguable that there may a technical violation of the regulation.

While the Plan itself did not establish claim procedures as directed by the regulation, It appears clear from my review of the administrative record that United States Life and DRMS did issue such claim procedures. Indeed, the record shows that throughout the evaluation, denial, and appeals process of Plaintiff's claim, Plaintiff was kept apprised of DRMS's procedures and Plaintiff's rights regarding creating the record and appealing the denial. Thus, whether authored by "the Plan" or not, there appear to be reasonable claim procedures in place which were followed in Plaintiff's case. *See* Def.'s Resp. in Opp'n to Pl.'s Mot. for J. on the Pleadings, Ex. A at 17 (Plan provisions for filing a claim); Ex. C (DRMS letter setting forth claim review and appeal procedures).

Courts have held that "[s]ubstantial compliance with procedural requirements will satisfy ERISA, provided the claimant has the opportunity for full and fair review." *Baker v. Tomkins Industries, Inc.*, 339 F. Supp. 2d 1177, 1186-87 (D. Kan. 2004) (citing *Sage*

*v. Automation, Inc. Pension Plan & Trust*, 845 F.2d 885, 895 (10th Cir. 1998)).[2] As stated by another court, "[t]echnical noncompliance will be excused as long as the notice substantially complies with the statute and regulation." *White v. Aetna Life Ins. Co.*, 210 F.3d 412, 414 (D.C. Cir. 2000). "In assessing whether a notice substantially complies, we consider not just the notice itself, but all communications between the insurance company and the claimant." *Id.*

In this case, while the Plan technically did not establish the claim procedures, I find that claim procedures were adopted that appeared to gave Plaintiff a full and fair review as discussed previously. While Plaintiff contends that DRMS was late in its denial letters and that it did not comply with certain timing requirements in connection with the claim, DRMS did let Plaintiff know what evidence it relied upon in making its decision, gave Plaintiff the opportunity to address the accuracy and reliability of the evidence, and considered the evidence prior to reaching and rendering its. Accordingly, the requirements for full and fair review appear to have been met. Thus, I find that there was substantial compliance with the regulation.

Even if reasonable claims procedures were not put into place such that there is a violation of 29 C.F.R. § 2560.503-1, Plaintiff would still not be entitled to judgment on the pleadings. The regulation states, "In the case of a failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant

---

[2] "A full and fair review means 'knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of the evidence, and having the decision-maker consider the evidence presented by both parties prior to reaching and rendering [its] decision.'" *Id.* at 1187 (quoting *Sage*, 845 F.2d at 895).

shall be deemed to have exhausted the administrative remedies under Section 502(a)

of the Act and shall be entitled to pursue any available remedies under section 502(a)

of the Act on the basis that the plan has failed to provide a reasonable claims

procedure that would yield a decision on the merits of the claim." 29 C.F.R.

§ 2560.503-1(l).

Applying the above regulation, Plaintiff is already before the Court and

Defendant has not challenged her exhaustion of administrative remedies.  Plaintiff is

thus entitled to pursue her remedies and must, as she acknowledges, show that

benefits are due under the terms of the Plan.  *See* Additional Material in Supp. of

Summ. J. for Pl. at 3.  I address the issue of whether Plaintiff has shown that she is

entitled to benefits in connection with Defendant's Motion for Judgment on the

Administrative Record.  I find, however, in the next Section of this Order that the case

must be remanded for further factfinding on whether Plaintiff is entitled to benefits.

Thus, Plaintiff has not shown as a matter of law from the record that she is entitled to

benefits.  Accordingly, Plaintiff's Motion for Judgment on the Pleadings is denied.

B.      Defendant's Motion for Judgment on the Administrative Record

Defendant moves for judgment on the administrative record on the basis that the

record conclusively demonstrates that the Plan properly denied Plaintiff long term

disability benefits.

1.      Plaintiff's Procedural Objections

In response, Plaintiff argues that Defendant's request for judgment on the

administrative record must be denied for several procedural reasons.  First, it is argued

that Defendant's own statements preclude judgment in its favor and mandate judgment in favor of Plaintiff. This is essentially a rehash of Plaintiff's Motion for Judgment on the Pleadings, and is denied for the reasons stated previously.

Plaintiff also argues that Defendant's motion seeks to deprive Plaintiff of the jury trial to which she is entitled under the Seventh Amendment of the United States Constitution. This argument was previously rejected by me in my Orders of September 21, 2007, and October 12, 2007, and is again denied for the record.

It is further argued by Plaintiff that Defendant's exhibits (the administrative record submitted by Defendant) must be stricken as unauthenticated inadmissible hearsay lacking foundation. I reject this argument for the reasons stated below and overrule/deny Plaintiff's Objection and Motion to Strike Exhibit A to Defendant's Motion for Judgment on the Administrative Record which addresses the same issue.

Plaintiff argues in this regard that the administrative record submitted by Defendant is inadmissible on the following grounds: (1) under FED. R. EVID. 901(a) as Defendant has provided no authentication which would support a finding that the documents are the administrative record in this case and the documents are not the administrative record since the entity that created this record (DRMS) had no authority to act; (2) under FED. R. EVID. 802 as the document is a compilation of out of court statements offered to prove the truth of the matter asserted and constitutes hearsay within hearsay; (3) under FED R. EVID. 806 as Plaintiff is entitled to examine each of the declarants from the various documents comprising Exhibit A on the statements as if under cross-examination.

I first address Rule 901(a). Plaintiff argues that Defendant did not offer any testimony or other evidence to support a finding that Exhibit A is actually the administrative record in this case and that, in fact, Exhibit A is not the administrative record. Plaintiff cites to the Tenth Circuit's definition of the "administrative record" as "the materials compiled by the administrator in the course of making [its] decision." *DeGrado v. Jefferson Pilot Financial Ins. Co.*, 451 F.3d 1161, 1169 (10th Cir. 2006). Plaintiff argues that the administrator did not compile any materials in the course of making its decision. In fact, Plaintiff asserts that the Plan neither made a decision, nor did it compile any materials as indicated in Defendant's Answer.

Plaintiff argues that since the Plan did not conduct a review of Plaintiff's claim for benefits, it did not create an administrative record. The record submitted by Defendant was compiled by DRMS, an entity Plaintiff asserts had absolutely no authority to create a record or act in any capacity on behalf of the Plan. Plaintiff concludes that Defendant has attempted to perpetrate a fraud upon this Court by submitting Exhibit A to the Court after admitting in its Answer that the Plan did not conduct a review of Plaintiff's claims and could not have gathered any materials in the course of making its decision.

Turning to my analysis, I first note that while administrative records in ERISA cases are typically submitted without an affidavit of authenticity, Defendant has submitted an affidavit authenticating the record in an abundance of caution. Thus, Rule 901 does not appear to have been violated.[3] I also note that Plaintiff does not cite to any portion of the record that she believes to be inauthentic.

---

[3] Further, Defendant is correct that such affidavits are not typically required in ERISA cases.

Second, I reject the argument that Defendant attempted to perpetrate a fraud upon this Court by submitting the administrative record that the claims administrator (DRMS) compiled. It is undisputed that DRMS was given the authority to and did conduct the claim review related to Plaintiff and that DRMS issued a decision denying Plaintiff's claim for disability benefits. Thus, it was not improper for the administrative record related to same to have been filed with the Court. The issue is whether DRMS was properly delegated the authority to conduct the claim review in the first instance. I turn to Tenth Circuit law on this issue for guidance.

Both parties contend that this issue is governed by *Geddes v. United Staffing Alliance Employee Medical* Plan, 469 F.3d 919 (10th Cir. 2006). In *Geddes*, the Tenth Circuit held, "*Firestone* does not limit the parties to whom a fiduciary may delegate its authority, beyond those limits implicit in the principles of trust law." *Id.* at 925. Consequently, it turned to trust law itself for further guidance. *Id.* It stated:

> Long-accepted trust doctrine holds that while a fiduciary may not delegate the entire administration of his trust absent specific authorizing language in the trust instrument, a fiduciary may delegate the performance of certain tasks "which it is unreasonable to require him personally to perform." . . . Trust law regards this discretion to delegate as inherent in the fiduciary-trustee. The fiduciary's inherent discretion is confirmed and extended when the authority to delegate is explicitly mentioned in the trust instrument. "By the terms of the trust a trustee may be permitted to delegate to agents or to co-trustees or to other persons the administration of the trust or the performance of acts which could not otherwise be properly delegated." . . .
>
> Importantly for the disposition of the issue before us, trust law does not require a fiduciary to delegate his authority only to other fiduciaries. Rather, the trustee is at liberty to delegate administrative tasks to "agents" or "other persons" as is necessary to carry out the purposes of the trust. . . . A fiduciary's decision to delegate does not violate his responsibility to the trust beneficiary insofar as the fiduciary himself remains personally liable for any

-14-

> decisions taken on his behalf. In sum, the fiduciary is responsible for actions performed in his name. . . . The same is true in the ERISA context.

*Id.* at 925-26 (internal quotations and citations omitted); *see also Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, (10th Cir. 2003) (approving a plan administrator's delegation of claim review authority to an independent third-party claims agency as an appropriate exercise of fiduciary discretion).

Here, while the Plan does not appear to contain procedures allowing entities other than the Plan Administrator to act on behalf of the Plan in any capacity, it is clear under *Geddes* that a fiduciary may delegate the performance of certain tasks which it is unreasonable to require it personally to perform. It is certainly arguable that the Plan Administrator (El Pueblo Boys' and Girls' Ranch) properly exercised its "inherent" power to delegate the processing and evaluation of disability benefits claims by its employees to United States Life, the insurer of the benefits. Indeed, the Plan told Plaintiff to submit a claim for benefits to United States Life, thus arguably implying a delegation. It is also arguable that United States Life, in turn—like the benefits provider in *Geddes*—properly retained a claims analysis expert, DRMS, to evaluate whether the individual claimants qualified for benefits.

Further, even if DRMS was not properly delegated the authority to conduct the claim review, this simply means that a denial of plan benefits is reviewed under the de novo standard. *See Samaritan Health Center v. Simplicity Health Care Plan*, 516 F. Supp. 2d 939, 950 (E.D. Wis. 2007) (if an unauthorized party makes the benefits determination, a denial of plan benefits is reviewed under the de novo standard) (citing *Sharkey v. Ultramar Energy Ltd.*, 70 F.3d 226, 229 (7th Cir. 1995), *Sanford v. Harvard*

*Indus., Inc.*, 262 F.3d 590, 597 (6th Cir. 2001) and other cases); *Shane v. Albertson's, Inc.*, No. 05-56319, 2007 WL 2983801, at *4 (9th Cir. 2007); *see also Sage v. Automation, Inc. Pension Plan and Trust*, 845 F.2d 885, 895 (10th Cir. 1988) ("[n]ot every procedural defect will upset the decision of plan representatives . . . . [t]he merits of the partial termination issue have been correctly resolved, no purpose would be served by a further, but procedurally correct, review of appellants' claims by the trustee"). Since I am already reviewing the Plan on a de novo basis, this issue does not provide Plaintiff any further relief.

I also reject the last procedural argument by Plaintiff—that the administrative record submitted by Defendant should be stricken under Rules 802 and 806. As to Rule 802, Plaintiff argues that the administrative record is hearsay and contains hearsay within hearsay. I reject this argument. As Defendant notes, the administrative record clearly falls within the business records exception stated in Fed. R. Evid. 803(6). Plaintiff also argues that she is entitled to examine the declarants from the various documents in the record on the statements as if under cross-examination pursuant to Rule 806. This argument is also rejected. Plaintiff cites no authority for this argument, and it is not supported by any case authority that I have located. Further, Rule 806 is inapposite as it applies to hearsay evidence which is submitted into evidence at trial.

Finally, I note as to Plaintiff's hearsay arguments that courts routinely allow in the administrative record in an ERISA case without reference to the hearsay rules. Under Plaintiff's evidentiary analysis, courts would never be able to analyze the administrative record because such record always consists of medical reports and

other out of court statements. Plaintiff's hearsay arguments are thus inapposite. The administrative record submitted by Defendant is admissible and will be relied on as the record in this case.[4]

### B.    The Merits of Defendant's Motion

Having rejected Plaintiff's procedural arguments, I now turn to the heart of Defendant's motion—that Plaintiff does not meet the definition of disability in the Plan and that Defendant is entitled to judgment on the administrative record.

### 1.    Standard of Review

It is undisputed that the Plan did not give discretion to the Administrator; accordingly, a *de novo* standard of review applies. "In conducting a *de novo* review, the district court's 'role is to determine whether the ERISA plan administrator made a correct decision based on the record before it at the time the decision was made.'" *Gilbertson v. AlliedSignal, Inc.*, 172 Fed. Appx. 857, 860 (10th Cir. 2006) (quotation omitted); *see also Pratt v. Petroleum Production Mgmt., Inc. Employee Savings Plan & Trust*, 920 F.2d 651, 658 (10th Cir. 1990). In making this determination, the court "'reviews the administrator's decision without deference to that decision and without any presumption of correctness.'" *Gilbertson*, 172 Fed. Appx. at 860 (quotation omitted). When interpreting the terms of an ERISA-governed plan under the *de novo* standard, a Court will "giv[e] the language its common and ordinary meaning as a

---

[4] I also accept for filing the portion of the administrative record (EPBGR 0042A.) submitted as Exhibit A to Defendant's Supplemental Brief in Support of Defendant's Motion for Judgment on the Administrative Record filed March 10, 2008. Defendant asserts that due to an apparent clerical or copying error, this page (page 5 of an appeal letter by Plaintiff's counsel) was missing from the record.

reasonable person in the position of the [plan] participant, not the actual participant, would have understood the words to mean." *Chiles v. Ceridean Corp.*, 95 F.3d 1505, 1511 (10th Cir. 1996) (quotation omitted).

As to the scope of such review, the Tenth Circuit has noted that federal courts should not "'function as substitute plan administrators.'" *Jewell v. Life Inc. Co. of N. Am.*, 508 F.3d 1303, 1308 (10th Cir. 2007) (quoting *Hall v. UNUM Life Ins. Co. of America,* 300 F.3d 1197, 1201 (10th Cir. 2002)). Consequently, *Jewell* indicated that "'the best way' for a district court 'to implement ERISA's purposes in this context is ordinarily to restrict de novo review to the administrative record' compiled during the claim administration process, instead of taking new evidence, hearing witnesses, and the like." *Id.* (quoting *Hall*, 300 F.3d at 1202).

Thus, "'it is the unusual case in which the district court should allow supplementation of the record,' . . . only 'exceptional circumstances could warrant the admission of additional evidence.'" *Id.* at 1309 (quotations omitted). This is because ERISA policy strongly disfavors expanding the record beyond that which was available to the plan administrator." *Id.* "Supplemental evidence should not be used to take a second bite at the apple, but only when necessary to enable the court to understand and evaluate the decision under review." *Id.*

Plaintiff argues that since the Plan did not compile an administrative record for review, she should be allowed to submit documents to the Court which she attempted to submit to the Plan through DRMS. I reject this argument, as I previously found that the administrative record submitted by Defendant was proper.

I also find that Plaintiff has not shown that "'circumstances clearly establish that additional evidence is necessary to conduct an adequate *de novo* review of the benefits decision.'" *See* Order filed September 21, 2007 at 2-3 (quoting *Ray v. Unum Life Ins. Co of Am.*, 224 Fed. Appx. 772, 779 (10th Cir. 2007) (quoting *Hall v. Unum Life Ins. Co. of Am.*, 300 F.3d 1197, 1202 (10th Cir. 2002).[5] As noted in that Order, Plaintiff has the burden of showing this and was alerted that she could argue this in her response brief. *Id.* at 3; *see also* Order of October 12, 2007. Plaintiff failed to make that showing. She also has not shown that this case is so unusual or exceptional that supplementation is necessary. Further, Plaintiff has not shown how the evidence is necessary to the court's de novo review, that Plaintiff could not have submitted this evidence to the plan administrator at the time the challenged decision was made, or that the evidence is not "'simply better evidence than the claimant mustered for the claim review.'" *Jewell*, 508 F.3d at 1309 (quoting *Hall,* 300 F.3d at 1203).

Plaintiff argues instead that the claim administrator had a duty to consider this evidence because it was submitted within 180 days of the appeal. While Defendant disputes that the 180 day time frame applies, I agree with Plaintiff that the regulation does make this time frame applicable to disability plans. *See* 29 C.F.R. § 2560.503-1(h)(4) (providing that the claims procedures for disability plans must comply with the requirements of (h)(3)(i) through (v); (h)(3)(i) provides for a 180 day review); *see also Price v. Xerox Corp.*, 445 F.3d 1054, 1056 (8th Cir. 2006 (finding that 180 day time

---

[5] The term "necessary" "connotes a stronger requirement than the mere possibility of utility", *i.e.*, "necessary" evidence cannot be evidence that is merely convenient or useful, or conducive to the end of conducting review by the Court. *Jewell*, 508 F.3d at 1310-11.

frame applied to adverse benefit determination of disability plan). Indeed, DRMS gave Plaintiff 180 days to appeal after its initial denial of her benefits claim. Administrative Record ["Rec"] at 0099, attached to Def.'s Br. in Supp. of Mot. for J. on Administrative Rec.

However, I agree with Defendant that the 180 day time frame does not apply to the appeal at issue as it was a second right to appeal provided by DRMS. *See* Rec. at 0002-05. The Eighth Circuit found that the 180-day requirement applied only to the first appeal, *i.e.*, the initial adverse benefit determination. *Price*, 445 F.3d at 1056-57. DRMS gave Plaintiff 180 days to file her initial appeal in accord with the regulations. Rec. at 0099. Plaintiff filed her appeal and it was denied. *Id.* at 0010-0014. DRMS then gave Plaintiff 60 days to file a second review of her claim, under its voluntary additional appeal procedures. *Id.* at 0004-0005.[6] As in *Price*, I find that Plaintiff failed to show that DRMS's provision of 60 days for the second appeal was unreasonable or otherwise not compliant with ERISA regulations. *Price*, 445 F.3d at 1056-57; *accord Price v. Xerox Corp.*, 379 F. Supp. 2d 1026, 1029 (D. Minn. 2005); *see also Denmark v. Liberty Life Assur. Co. of Boston*, No. Civ. A 04-12261, 2005 WL 3008684, at *15 n.15 (D. Mass. 2005) (regulations do not require more than one level of internal review of an adverse benefits determination).

---

[6] I reject Plaintiff's argument in her supplemental brief that she was unlimited in her ability to present new evidence on the second appeal because the Plan did not contain a deadline to do so. DRMS clearly notified Plaintiff that she had 60 days to ask for a second review and to provide any additional information to be considered. Rec. at 0005. DRMS further informed Plaintiff that any request submitted after the end of the 60 day period would not be considered. *Id.*

Accordingly, I limit my review to the administrative record provided by Defendant.  I first address the relevant medical and other evidence and then address whether Defendant properly denied Plaintiff's claim for benefits.

2.     Record Evidence

On January 7, 2002, Plaintiff consulted her primary care physician, Dr. Michael A. Ramos, regarding a variety of symptoms, including arthralgias, myalgias, and back pain.  Rec. 0326.  On March 27, 2002, Plaintiff consulted with Dr. Ramos regarding arthritis in her hands and back, issues with her weight, headaches, and tingling in her extremities.  *Id.* 0325.  On August 27, 2002, Dr. Patrick K. Timms, a rheumatologist Plaintiff consulted pursuant to a referral from Dr. Ramos, diagnosed Plaintiff with "polymyalgias, nonrestorative sleep, and multiple soft tissue tender points strongly suggest[ing] fibromyalgia."  *Id.* at 0053-54, 0255-56.  Dr. Timms prescribed Trazodone and Celebrex and discussed with Plaintiff the need for stretching and strengthening, although he recognized that it would be difficult for Plaintiff to do given her work schedule and family responsibilities.  *Id.*

On September 17, 2002, Plaintiff again saw Dr. Timms for fibromyalgia and sleep problems, and was prescribed Ambien and Ultracet.  Rec. at 0253-54.  She reported Celebrex was unhelpful and Trazodone slightly improved her sleep but she remained fatigued.  *Id.*  Dr. Timms diagnosed fibromyalgia.  *Id.*

On September 30, 2002, Dr. Ramos stated that Plaintiff needed a temporary leave of absence from work, "two weeks for now."  *Id.* at 0063.

September 30, 2002 was Plaintiff's last day at work at El Pueblo Boys' & Girls' Ranch. Plaintiff claimed to be incapable of continuing her employment. Rec. at 0112.

On October 14, 2002, Plaintiff consulted Dr. Ramos for headaches and cervical spine pain and received a normal reading on a CT scan and x-rays. Rec. at 0312. He noted that Plaintiff "does have some fibromyalgia and has tried numerous antiinflammatory medications." *Id.* He ordered a neurologic evaluation. *Id.*

On October 28, 2002, upon a referral from Dr. Ramos, Plaintiff consulted with neurologist Dr. Ashakiran Sunku. Rec. at 0281-286. His impressions were "chronic neck pain with pain in a generalized fashion, as well as paresthesias, but the pain is most pronounced in the left upper extremity", "Chronic headaches", and "Insomnia, improved." *Id.* at 0283. Dr. Sunku suggested an MRI and EMG. *Id.* He also noted that Plaintiff brought up whether she should continue to work. *Id.* He stated that he informed Plaintiff "that from the neurological point, I have no contraindications for her to go back to work, but if she feels it is causing her any stress, then she should discuss this with Dr. Ramos or probably even a psychiatrist who can help her with her stress." *Id.*

On November 19, 2002, Plaintiff saw Dr. Ramos for heartburn, headaches, and fibromyalgia. Rec. at 0307. An MRI, lab work, and x-rays yielded no helpful findings. *Id.* Her fibromyalgia was exacerbated by activity and was not responsive to anti-inflammatories. *Id.* Dr. Ramos noted that Plaintiff's fibromyalgia was being followed by Dr. Timms. *Id.* Also on that same date, Dr. Ramos found that Plaintiff needed to continue to be off work secondary to her medical problems. *Id.* at 0063.

Also on November 19, 2002, Plaintiff saw Dr. Sunku who Dr. Ramos noted was evaluating Plaintiff for her headaches. Rec. at 0307. Dr. Sunku found Plaintiff's brain MRI and lab tests were negative, and EMG nerve conduction studies of upper and lower extremities were within normal limits. *Id.* at 0279-80. Dr. Sunku diagnosed "Generalized pain but more pronounced in the right half of the body", "Scalp tenderness, headaches" and "Paraesthesias." *Id.* at 0280. He encouraged Plaintiff to follow up with Dr. Timms "as this is probably her fibromyalgia and he probably would be able to help her with the fibromyalgia." *Id.*

On December 9, 2002, Dr. Ramos issued a statement diagnosing Plaintiff with fibromyalgia, fatigue, headache, and joint pain. Rec. at 0090. He certified that Plaintiff was totally disabled for her own job, as well as any other job. *Id.* at 0091. He found that Plaintiff had both a Class Five physical and mental/nervous impairment as a result of her fibromyalgia. *Id.* at 90-91. He also stated that a fundamental or marked change in the future was expected, although he did not indicate when Plaintiff would sufficiently recover to perform her duties. *Id.* On that same date, Plaintiff submitted her application for long term disability benefits. *Id.* at 0112-117. Included in Plaintiff's application for benefits was the Physician Statement from Dr. Ramos to the effect that Plaintiff was currently totally disabled for her job or any other job. *Id.*

On December 17, 2002, Plaintiff saw Dr. Timms for fibromyalgia and headaches and was prescribed Zanaflex, Mobic and if no improvement with Mobic, Neurontin. Rec. at 0252. She reported that Ambien, Ultracet, and Darvocet were not helpful and that she was taking Vicodin for the headaches. *Id.* Dr. Timms noted that Plaintiff "has

stopped work because of her pain." *Id.* He also noted that he discussed with Plaintiff "the use of long term narcotics in fibromyalgia pain" but noted that "[t]his would be a last resort and she would need to have this procured from only a single provider." *Id.* Finally, Dr. Timms noted that Plaintiff would return for follow-up in four (4) months. *Id.*

On December 18, 2002, Plaintiff saw Dr. Sunku for chronic headaches, dizziness, paresthesias and for further recommendations. Rec. at 0277. She noted that her headaches were occurring at least three times per week and significantly bothering her. *Id.* Dr. Sunku prescribed Verapamil. *Id.* at 0278.

On January 3, 2003, El Pueblo Boys'& Girls' Ranch provided DRMS with a job description of Plaintiff's position during her employment. Rec. at 0107-09. The physical abilities required for the position were "Must be able to exert 11 lbs. to 20 lbs. of force occasionally and/or greater than negligible to 10 lbs. of force frequently to lift, carry, push, pull, or otherwise move objects," and "Requires sitting most of the time, but involves occasional walking and standing." *Id.* at 0108. There were also significant mental requirements, including reasoning, language and mathematical reasoning. *Id.* at 0109.

On January 9, 2003, Andrea Dube, Senior Managed Disability Analyst with DRMS, conducted an initial telephone interview with Plaintiff, who reported her symptoms as muscle and body aches, inability to concentrate or sleep, and constant headaches. Rec. at 0130-31.

On January 22, 2003, Plaintiff saw Dr. Sunku again for chronic headaches and dizziness. Rec. at 0268-70. Plaintiff reported that her intense headaches had

subsided on Verapamil.  *Id.* at 0269.  She was still experiencing two or three

headaches per week which were "nagging", but she did not have to lie down to stop her

activities.  *Id.*  He noted a "marked improvement" in Plaintiff's chronic

headaches/migraines and improvement in dizziness but persisting muscle contraction

headaches.  *Id.*  He continued treatment with Verapamil and increased Neurontin to

help with the muscle contraction headaches.  *Id.* at 0270.

On February 24, 2003, Kelly Haines, a registered nurse consultant for

DRMS, issued the conclusion that, based on Plaintiff's objective test results and

treatment records from Drs. Ramos, Sunku and Timms, Plaintiff was not disabled.  Rec.

at 0456-58.  She found:

> The information from the claimant's treating physicians cannot identify
> any objective basis for the claimant subjective complaints of pain.  There
> appears to be a psychiatric component to her loss of work capacity.  Dr.
> Sunku recommended she discuss with Dr. Ramos and obtain a
> psychiatric consult.  She doesn't appear to be receiving appropriate
> treatment for this condition.  One would expect a referral or diagnosis
> regarding stress management.
> · · ·
>
> I do not feel the medical data supports any restrictions and limitations.  Her
> physical exam findings are within normal limits.  She reports 3 headaches pe
> week to the neurologist in 12-02.  Prophalactic medication was started for the
> suspect of migraines.  There is no indication or follow up indicating this was not
> successful or that another medication or therapy was initiated due to failure to
> respond.  There is no indication she has called for severe, daily headaches, as
> reported in the 1-9-02 telephone call with Andrew Dube.  Then she indicates the
> headaches are better, not as bad but she can't predict them.  The medications
> she notes include the prophylactic Verapamil prescribed in 12-02.
> The primary loss appears to be have been due to stress related to the work
> environment as noted in the initial evaluation by Dr. Sunku in 10-02.  The
> claimant is not receiving the care and treatment one would expect if this
> condition was severe enough to preclude sustainable functional capacity.

*Id.* at 0458.

On March 10, 2003, Dr. Ramos provided an updated Attending Physician's Statement, noting Plaintiff's diagnosis as fibromyalgia and her symptoms as fatigue, headache, and joint pain. Rec. at 0305-06. He stated that Plaintiff's condition was unchanged and rated her physical and mental impairments as Class 5 (severe limitation on functional capacity, incapable of sedentary activity). *Id.* He still expected a marked change in her condition to occur, but did not opine on when Plaintiff would be able to work. *Id.*

On March 13, 2003, Dr. Thomas Reeder, a physician consultant for DRMS, analyzed Plaintiff's medical records. Rec. at 0453. A note from Kelly Haines, RN, in the record states:

> This file continues to lack medical evidence to support an impairment, which would preclude sustainable functional activities. If the claimant's condition was severe enough to warrant a class 5 physical and class 5 mental and nervous impairment she should be receiving treatment by specialists for her conditions. Given the last office visit was in 11-02, it is unclear to me how he can comment appropriately on her functional capacities or limitations.

Rec. at 0453. Dr. Reeder states he reviewed that, "discussed, and I agree." He further stated:

> A/P Ramos has no evidence of diagnosis or disability as of his 12/9/02 APS. When he last saw her in 11/02, there was no physical abnormality or comment re: impairment. The Rheumatoloist has not supported impairment nor has the neurologist. Dr. Ramos does not provide credible evidence of any impairing condition.

*Id.*

On March 14, 2003, DRMS denied Plaintiff's request for disability benefits based on her fibromyalgia diagnosis. Rec. at 0097-99. DRMS's letter noted that the

medical records from Drs. Ramos, Sunku and Timms were received and reviewed by one of its Registered Nurse Consultants as well as a consulting physician. *Id.* at 0097. It further noted the opinion of its consulting physician and found that Plaintiff's disability claim was denied based on the absence of any objective basis for her complaints, the lack of medical evidence of or specifics regarding limitations on her abilities, and the absence of any psychiatric treatment, which treatment would be expected in the case of a Class 5 impairment. *Id.* at 0097-99. DRMS notified Plaintiff that she could appeal this claim decision by sending a sending a written request to DRMS within 180 days of receipt of this notice. *Id.* at 99.

On March 18, 2003, Dr. Sunku found Plaintiff experienced migraine headaches which "appear to be under very good control", "Generalized pain and chronic daily headaches probably related to her fibromyalgia", and "Insomnia". Rec. at 0257-58. Dr. Sunku noted Plaintiff's lab results were normal and recommended increasing the Neurontin, continuing the Verapamil, and adding Klonopin or Restoril. *Id.*

On April 2, 2003, Plaintiff saw Dr. Timms for follow-up of Plaintiff's fibromyalgia. Rec. at 0088. He found that Plaintiff was not doing well at all, was hurting from head to toe, was not sleeping at night, continued to have significant headaches, and has "marked difficulty concentrating, and even small tasks cause severe fatigue." *Id.* Dr. Timms opined that Plaintiff's fibromyalgia was "significantly disabling Plaintiff at this time" and stated as to disability issues, "In my opinion she is not able to work in any meaningful capacity at this time." *Id.*

On June 25, 2003, Plaintiff appealed DRMS's denial of disability benefits, citing her medical history and claiming Nurse Haines was not qualified to analyze her medical records for DRMS. Rec. at 0039-93.

On August 4, 2003, Dr. Noreen F.B. Ferrante, a consulting rheumatologist, issued her findings from a review of Plaintiff's medical records and discussions with Drs. Ramos and Timms. Rec. at 0369-77. She found that the diagnosis of fibromyalgia was supported by the medical records, that Plaintiff is probably able to function at least in a Class 4 (sedentary) capacity, but that a functional capacity evaluation ["FCE"] may be helpful as an objective measure of Plaintiff's abilities; fibromyalgia is exacerbated by both activity and inactivity; Plaintiff's migraines were controlled and there is no evidence that the muscle contraction headaches impair Plaintiff from sedentary to light work; and "[th]ere does appear to be a serious *psychiatric* condition" although there is not enough detail in the record for a specific diagnosis and a psychiatric diagnosis, a psychiatric consultation would be appropriate. *Id*.

Dr. Ferrante also noted in her evaluation Dr. Ramos' rating of a Class 5 disability, but stated that in her conversation with him he thought Plaintiff was probably physically capable of sedentary work if there were no consideration of psychiatric issues. Rec. at 0375. Dr. Ferrante found that this implied that psychiatric issues are Plaintiff's biggest roadblock to working. *Id*. Dr. Ferrante also noted that Dr. Timms had opined in April 2003 that Plaintiff was not able to work. *Id*. However, she noted that in her conversation with Dr. Timms on July 29 2003, he was quick to point out that he did not know if Plaintiff could do sedentary work because she had not had a FCE and that

he had no objective data on which to base his opinion. *Id.* at 0375-376. He also noted to Dr. Ferrante that Plaintiff's self-reported activity questionnaires report levels of activity that are virtually identical to many of his fibromyalgia patients who continue to work. *Id.*

On August 4, 2003, Dr. Ferrante issued a letter to Dr. Timms, requesting confirmation that Dr. Timms had not filled out an attending physician statement of disability and that he had not been asked to do so, that Plaintiff's fibromyalgia was comparable to that of his other patients who are able to work, that medications did not impact Plaintiff's fibromyalgia, that there was no objective data supporting Plaintiff's disability, and that functional capacity testing would be helpful. Rec. at 0357-358. On August 8, 2003, Dr. Timms signed the letter indicating that he agreed to its contents. *Id.* at 0358.

On August 4, 2003, Dr. Ferrante also issued a letter to Dr. Ramos, requesting confirmation of their conversation; namely, that Plaintiff was unable to interact socially, that her migraines were resolved but that her muscle contraction headaches were not, that psychiatric problems were at the base of Plaintiff's physical complaints, that antidepressants were unhelpful, that Plaintiff was capable of sedentary tasks, and that there was no objective data to support Plaintiff's disability. Rec. at 365-66. Dr. Ramos did not sign or concur with the letter. *Id.*

On August 15, 2003, Dr. Ramos wrote a letter to Dr. Ferrante clarifying statements she made in her letter. Rec. at 0022. He stated therein that being a rheumatologist, Dr. Ferrante should be well aware of the emotional situation that

people with fibromyalgia are faced with, and that the only psychiatric problem that Plaintiff has is related to the stress/depression associated with her clinical problem of fibromyalgia. *Id.* He also stated that he felt Dr. Ferrante's "interpretation of the conversation was for the benefit of another party and not an 'independent' evaluation" of the Plaintiff." *Id.*

On August 26, 2003, DRMS received a report on surveillance it had ordered on Plaintiff. Plaintiff had been observed walking normally, watering her lawn, lifting, carrying, and conducting a lengthy yard sale at her home. Rec. at 0187.

On September 15, 2003, Dr. Alan M. Elkins, a psychiatric consultant for DRMS, issued his conclusions from reviewing Plaintiff's medical records. Rec. at 0227-31. Dr. Elkins opined that "the information in the file does not contain a psychiatric evaluation and therefore it is not possible to render an opinion" regarding whether Plaintiff's mental condition precluded her from employment and whether her mental condition was related to her fibromyalgia. *Id.* at 0230-31. He did note, however, that "individuals with fibromyalgia often do have symptoms of what may be a psychiatric illness", but without any assessment or report of Plaintiff's mental condition in the record, he was unable to make a further determination." *Id.* He also noted that there were reports of difficulty in concentrating by Plaintiff, but there was no testing for concentration difficulties or cognitive testing. *Id.*

On September 25, 2003, Plaintiff underwent a functional capacity evaluation ["FCE"]. The conclusions were that Plaintiff made a valid effort to perform during the examination; that she demonstrated a grip deficit and subaverage lifting ability; that she

was limited to light or sedentary activity with limited bending, squatting, and overhead activity; that she was able to sit with hourly breaks; and that she reported cognitive deficits. Rec. at 0134-49. The report noted that the cognitive deficits which Plaintiff noted (including inability to concentrate and focus, decreased memory, difficulty finding right words to use) were not tested in the FCE. *Id.* at 0139.

On October 13, 2003, DRMS received a second report of surveillance on Plaintiff. She was observed walking normally for about one-half mile, filling and unloading a shopping cart, moving a trash can, and otherwise moving freely. The reporter also investigated the advertising for the previously recorded yard sale and noted that Plaintiff had anticipated her capability to conduct the sale by advertising at least five days in advance and scheduling the sale for a date certain. Rec. at 0168-72.

On October 14, 2003, DRMS notified Plaintiff regarding her appeal. DRMS admitted Plaintiff's diagnosis of fibromyalgia but denied that the medical evidence supported a finding of disability, and noted that disability status was inconsistent with the medical reviews of Plaintiff's records, the results of the FCE, and the surveillance reports. Rec. at 0010-14. It further noted that DRMS would continue on with its review, and would provide the results of the FCE and the surveillance videos to Drs. Murphy, Ramos and Timms. *Id.* at 0013. DRMS stated that once it received a response from Dr. Ramos and Timms, it would provide Plaintiff with its determination. *Id.*

On October 30, 2003, Dr. Ferrante issued an addendum based on her review of Plaintiff's FCE and the videos, stating that Plaintiff had the physical capacity to perform fulltime sedentary to light work, with regular opportunities for positional

changes and limitation of repetitive fine motor activity to 15 minutes at a time and 30 minutes in any one hour.  Rec. at 0332-50.

On November 26, 2003, Dr. Timms wrote a letter to express his views about Plaintiff's long term disability as it relates to fibromyalgia.  Rec. at 0236.  He stated that on April 2, 2003, his opinion had been that Plaintiff was incapable of meaningful work, but currently he concurred with Dr. Ferrante "in regards to the physical functional capacity of the patient in regards to her employment."  *Id.* at 0237.  However, he stated that he felt there were other issues that need to be addressed in regards to the impact of fibromyalgia and work status issues.  *Id.*  Specifically, he noted that stress may greatly exacerbate fibromyalgia symptoms and that Dr. Timms knew there was the potential for significant job related stress at Plaintiff's former job at El Pueblo Boys and Girls Ranch, that there are issues in regards to fatigue as well as concentrating deficits, and that Plaintiff continues to have significant headaches and short term memory and concentrating ability.  *Id.*  Dr. Timms felt that Plaintiff should undergo testing of her short term memory as well as concentrating ability as well as receive an independent medical evaluation from a neurologist.  *Id.*

On December 2, 2003, Dr. Ramos opined that, after a review of the results of the FCE and "the contents" of the surveillance videos, these findings conformed with his earlier diagnosis that Plaintiff was totally disabled from fulltime work by fibromyalgia and had been since September 30, 2002.  Rec. at 0328.  He noted that fibromyalgia does not prevent Plaintiff from doing any of the tasks in the FCE and that she can perform many normal tasks on any given day.  *Id.*  However, he stated that she is not

capable of performing these tasks eight hours a day, five days a week, as is required for full time work. *Id.* He also stated his disagreement with Dr. Ferrante's letter of October 29, 2003, and stated that he would not sign the letter. *Id.*

On January 8, 2004, DRMS affirmed the denial of long term disability benefits, finding no physical disability and no basis for evaluating a psychiatric disability. Rec. at 0002-05. DRMS notified Plaintiff that she had 60 days to request a second review of her claim. *Id.* at 0004-05.

3.    <u>The Merits of Plaintiff's Disability Claim</u>

In order for Plaintiff to be eligible to receive long-term disability benefits, Plaintiff must show that she meets the definition of disability in the Plan. The Plan defines disability as follows:

TOTAL DISABILITY means:

- during the waiting period and next 36 months, your complete inability to perform the material duties of your regular job; "your regular job" is that which you were performing on the day before total disability began
- after such 36 months, your complete inability to perform the material duties of any gainful job for which you are reasonably fit by training, education or experience.

The total disability must be a result of an injury or sickness. To be considered totally disabled, you must also be under the regular care of a physician.

PARTIAL DISABILITY means that you are not able to perform the material duties of your regular job, but you are able to perform:

- at least one of these duties on a part-time basis, or
- at least one, but not all, of these duties on a full-time basis.

Your regular job" is that which you were performing on the day before disability began.

The partial disability must be a result of an injury or sickness.

DISABILITY means total and/or partial disability.

Rec. at 0482.

Since the decision denying disability benefits was made within 36 months of the disability application, I must consider whether the evidence supported Plaintiff's complete inability to perform the material duties of her regular job, meaning the job she was performing on the day before total disability began. As to the details of Plaintiff's job, Plaintiff was Human Resources Director. This was a professional job which was "primarily comprised of mental activities and physically sedentary in nature. *See* Def.'s Br. in Supp. of Mot. for J. on the Administrative Record at 11.

Turning to the merits of the disability decision, Defendant argues that none of the medical professionals in the case disagreed with Plaintiff's diagnosis of fibromyalgia, but only Dr. Ramos opined that Plaintiff remained incapable of performing her job throughout DRMS's evaluation of her application. Further, Defendant asserts that as noted by several of the other evaluators, Dr. Ramos based his opinion solely on Plaintiff's subjective complaints and could offer no objective support for his conclusion; on the contrary, the multiple medical tests he ordered for Plaintiff yielded negative or normal results, as did those ordered by Dr. Sunku. Defendant also argues that while Plaintiff's treating rheumatologist initially opined that Plaintiff was not capable of performing any medical work, he later concurred with Dr. Ferrante that Plaintiff could perform sedentary to light occupational tasks with restrictions.

Further, Defendant notes that Dr. Sunku, the treating neurologist, found no contraindications for Plaintiff's ability to work, and that both of DRMS's consulting evaluators (Nurse Haines and Dr. Reeder) concluded that there was no medical basis for Plaintiff's assertion that she was disabled. Also, Dr. Ferrante, the consulting rheumatologist, found that Plaintiff has the physical capacity to work with certain restrictions. Defendant argues that Dr. Timms' and Dr. Ferrante's findings as to Plaintiff's physical capacity to work are supported by the FCE and by the surveillance videos taken of Plaintiff in this case.

Defendant concludes that the medical evidence available to DRMS in deciding Plaintiff's appeal weighed overwhelmingly in favor of affirming the denial of disability benefits. Defendant further asserts that like the situation in *Gilbertson v. AlliedSignal, Inc.*, 172 Fed. Appx. 857 (10th Cir. 2006), there is a "lack of any reasonable medical evidence" concerning the effect of Plaintiff's fibromyalgia on her ability to work. When DRMS issued its final denial of Plaintiff's application for disability benefits in January 2004, the overwhelming evidence from medical experts and from the investigation of Plaintiff's activities supported the denial. Thus, it is argued that this Court's de novo review of this evidence mandates the same conclusion, and judgment must enter for Defendant on the administrative record.

Plaintiff contends in response that both her rheumatologist who made the diagnosis of fibromyalgia (Dr. Timms) and her general practitioner (Dr. Ramos) certified that she is completely unable to work as a result of her fibromyalgia. Thus, she argues that the available medical evidence consistently demonstrates that Plaintiff has

remained completely unable to perform the material duties of her regular job, as well as any other full-time job since Dr. Ramos instructed her to leave work on September 30, 2002.  Further, Plaintiff argues that the medical evidence clearly supported the fact that a psychiatric evaluation should be conducted, and that D RMS erred when it decided not to seek any additional evidence regarding Plaintiff's psychiatric condition.  Finally, Plaintiff argues that DRMS erred when it refused to consider the psychiatric evaluation provided by Plaintiff.

Turning to my analysis, I find that DRMS's decision did not take into account or make adequate findings as to all of Plaintiff's impairments and whether these impairments impacted her ability to work.  Accordingly, I that the case should be remanded for further fact finding.  *See DeGrado v. Jefferson Pilot Financial Ins. Co.*, 451 F.3d 1161, 116 (10th Cir. 2006) ("if the plan administrator 'fail[ed] to make adequate findings or to explain adequately the grounds of [its] decision,' the proper remedy 'is to remand the case to the administrator for further findings or explanation'") (quoting *Caldwell v. Life Ins. Co. of North Am.*, 287 F.3d 1276, 1288 (10th Cir. 2002)).

The key issue in this case in my opinion relates to the nonphysical requirements of Plaintiff's job and the extent to which Plaintiff's impairments may impact same. These impairments include Plaintiff's cognitive functioning, stress and/or other mental impairments, chronic headaches and fatigue.  The record clearly demonstrates the existence of such impairments.  While Defendant attempts to argue that Plaintiff's psychological impairments are a separate condition, unrelated to fibromyalgia, I disagree.

Dr. Ramos opined that Plaintiff had both a Class Five physical and mental/ nervous impairment as a result of her fibromyalgia. *Id.* at 90-91. Dr. Ramos also wrote a letter in response to Dr. Ferrante's findings that as a rheumatologist Dr. Ferrante should be well aware of the emotional situation that people with fibromyalgia are faced with, and that the psychiatric problem that Plaintiff has is related to the stress/depression associated with her clinical problem of fibromyalgia. *Id.* at 0022.

Dr. Timms, Plaintiff's rheumatologist/specialist in fibromyalgia, found that Plaintiff was not doing well at all, was not sleeping at night, continued to have significant headaches, and has "marked difficulty concentrating, and even small tasks cause severe fatigue." Rec. at 0088. Dr. Timms opined that Plaintiff's fibromyalgia was "significantly disabling Plaintiff at this time" and that she could not work. While he later revised his opinion, particularly in regards to Plaintiff's physical capacity to perform work, he specifically stated that there were other issues that need to be addressed in regards to the impact of fibromyalgia and work status issues. Rec. at 0236-237. Specifically, he noted that stress may greatly exacerbate fibromyalgia symptoms and that he knew there was the potential for significant job related stress at Plaintiff's job. He also noted that there are issues in regards to fatigue as well as concentrating deficits, and that Plaintiff continues to have significant headaches and short term memory and concentrating ability. *Id.* Dr. Timms felt that Plaintiff should undergo testing of her short term memory as well as concentrating ability as well as receive an independent medical evaluation from a neurologist. *Id.*

The stress, cognitive deficits such as ability to concentrate, and fatigue evidenced in the record were never assessed in any meaningful way by RMS. Indeed, the FCE ordered by DRMS specifically noted that Plaintiff complained of cognitive deficits which were not evaluated. Rec. at 0139. These issues were also not assessed or evaluated by DRMS's consulting medical personnel. Dr. Ferrante opined that while Plaintiff could work from a physical capacity, there appeared to be a serious psychiatric condition for which a psychiatric consultation would be appropriate. Rec. at 0369-77. She also specifically noted that the psychiatric issues appear to be the major roadblock to working, according to Dr. Ramos, and that there is not enough detail in the record for a specific psychiatric diagnosis. *Id.*

DRMS did end up ordering a psychiatric evaluation. However, in so doing, it ignored Dr. Ferrante's finding that there was not enough in the record for a psychiatric diagnosis to be made and ordered an evaluation based on the record only. The psychiatrist, Dr. Elkins, confirmed Dr. Ferrante's opinion that "the information in the file does not contain a psychiatric evaluation and therefore it is not possible to render an opinion" regarding whether Plaintiff's mental condition precluded her from employment and whether her mental condition was related to her fibromyalgia. Rec. at 0230-31. He did note, however, that "individuals with fibromyalgia often do have symptoms of what may be a psychiatric illness", but without any assessment of report of Plaintiff's mental condition in the record, he was unable to make a further determination." *Id.* He also noted that there were reports of difficulty in concentrating by Plaintiff, and there was no testing for concentration difficulties or cognitive testing. *Id.*

All of this evidence showed the need for further evaluation of Plaintiff's cognitive deficits and stress and the need for an independent psychological evaluation of Plaintiff to assess the impacts of psychological impairments from the fibromyalgia. However, DRMS ignored this evidence, instead finding that Plaintiff could perform her job and was not disabled. This was improper. Plaintiff's job as Human Resources Director was considered to be a professional job by her employer, as noted by Defendant. *See* Def.'s Br. in Supp. of Mot. for J. on the Administrative Record ["Def.'s Br."] at 11. Indeed, Defendant noted the employer's requirement that the Director have a four-year college degree and at least two years of employment in human resources. *Id.* Further, Plaintiff's duties including many complex tasks which would arguably require significant cognitive functioning and which could be impacted by levels of stress.[7] Indeed, Defendant acknowledges that Plaintiff's job "primarily comprised of mental activities." Def.'s Br. at 11.

---

[7] Plaintiff was expected to perform, among other things, the following tasks in her job: plan, develop and administer policies and procedures relating to all phases of personnel activities; manage employment and staffing activities; manage facility's compensation program and payroll functions; develop, administer, and analyze wage/salary reports/data to determine competitive compensation programs; project employment needs and staff to meet organizational needs; develop, facilitate, or coordinate employee training and development programs; administer facility's welfare and benefit programs; write directives, interpretive memorandums and articles advising management and employees of organization policy, procedure and legal requirements; consult legal counsel and other appropriate sources to ensure that policies comply with federal and state law; develop and maintain a human resources information system to meet management information needs; oversee development, maintenance and communication of records required by law, governing bodies, and regulatory agencies relating to areas of responsibility; study legislation, arbitration decisions, and employment law cases to maintain current knowledge of human resources issues; compile and submit occupational accident and illness information required by regulatory agencies; manage organization's worker's compensation program; participate in the investigation in accidents, injuries, and employee relations; prepare materials and evidence for use in hearings, legal proceedings, and insurance investigations; represent organization at personnel related hearings and investigations; and initiate, review and/or recommend personnel actions such as promotions, transfers, discharges and disciplinary measures. Rec. at 0109.

DRMS did not have substantial evidence about the extent or effects of Plaintiff's cognitive functioning, stress or other psychological factors, fatigue on Plaintiff's ability to perform her job. Indeed, DRMS's own consulting doctors indicated that testing and/or consultations needed to be made on these issues. All of this strongly supports a finding that these impairments may impact Plaintiff's ability to perform her job. The plan administrator "cannot shut their eyes to readily available information when the evidence in the record suggests that the information might confirm the beneficiary's theory of entitlement and when they have little or no evidence in the record to refute that theory." *Gaither v. Aetna life Ins. Co.*, 388 F.3d 759, 773 (10th Cir. 2004). Instead, an ERISA fiduciary presented with a claim that a little more evidence may prove valid should seek to get to the truth of the matter. *Id.* at 773-774.

In its supplemental brief, DRMS argues that Plaintiff has to show that she was under the regular care of a physician for a condition, and that she was not under the care of a psychiatrist or other mental health care provider. This ignores and/or misconstrues the evidence in the record. It is undisputed that Plaintiff was seeing medical providers for her fibromyalgia. As part of that treatment, Plaintiff was receiving treatment for stress or other psychological impairments from Dr. Ramos through his prescription of antidepressants. The claim administrator did not properly assess this evidence.

DRMS also asserts that its denial of benefits was proper as to any psychological impairments because Plaintiff and/or her attorney specifically refuted any psychiatric claim to her disability in the appeal. Again, DRMS misconstrues the evidence on this

issue. According to the evidence DRMS indicated that there appeared to be a psychiatric component to Plaintiff's loss of work for which she was not receiving treatment. Rec. at 0042A. Plaintiff's counsel stated in response that this assertion was invalid for two reasons. *Id.* First, Plaintiff is seeking LTD benefits for fibromyalgia and headaches, both of which are physical, not psychiatric disorders. *Id.* He went on to state, however, that fibromyalgia is commonly accompanied by fatigue, sleep disorders, lack of concentration, changes in mood or thinking, anxiety and depression. *Id.*

Thus, counsel made clear that all of these impairments, including anxiety and depression which could be characterized as psychological in nature, were part of the fibromyalgia diagnosis. This is supported by the medical evidence, as discussed above. Indeed, Dr. Ramos, Dr. Timms and DRMS's consultant Dr. Ferrante all thought that the psychiatric component and/or impairments such as lack of concentration were related to Plaintiff's fibromyalgia. This was buttressed by Dr. Elkins' findings that persons with fibromyalgia often have symptoms of what may be a psychiatric illness. Accordingly, these alleged impairments needed to be properly evaluated as part of the claim for benefits under the fibromyalgia diagnosis. DRMS erred when it chose not to do so.

I thus find that DRMS rejected the claim without a substantial basis to do so as to these impairments. *Id.* This requires a remand. I further note that DRMS denied benefits on this issue based on improper speculation and/or findings which were not supported by the evidence. Specifically, DRMS's nurse consultant opined that "[i]f the claimant's condition was severe enough to warrant a class 5 physical and class 5

mental and nervous impairment" she should be receiving treatment by specialists for her conditions." Rec. at 0453. This was agreed to by Dr. Reeder. *Id.* However, Plaintiff was seeing a specialist for these conditions; namely, her rheumatologist. She was also receiving treatment for her depression from her consulting physician, Dr. Ramos, who prescribed antidepressants.

To the extent that DRMS rejected the findings of mental impairments based on the fact that its nurse or other medical consultants would have expected a referral or diagnosis to have been made regarding stress management or because Plaintiff "is not receiving the care and treatment one would expect if this condition was severe enough to preclude sustainable functional capacity" (Rec. at 0458), this again is improper. The record evidence clearly supported the findings of stress and/or other psychiatric issues, and showed treatment for this from her treating physician. The fact that Plaintiff did not receive treatment from a psychiatrist or other specialist in this area does not allow DRMS to reject the record evidence on this issue. Instead, this issue needed to be explored and developed by DRMS as to whether it impacted Plaintiff's ability to perform her job, particularly in light of DRMS's own consulting physician's finding that such an assessment needed to be conducted. This is another basis for remand.

I also question whether DRMS adequately assessed Plaintiff's ability to perform the physical requirements of her job. I first note that while Plaintiff argues that DRMS should have relied on the opinion of Dr. Ramos who found that Plaintiff was unable to perform those requirements, I do not agree. The opinions of the rheumatologists, the specialists on fibromyalgia, certainly appear to be more persuasive on the issue of how

Plaintiff's fibromyalgia impacts the ability to perform her job. Other than Dr. Ramos, I agree with Defendant that the other medical evaluators in the case, including Plaintiff's rheumatologist, Dr. Timms, opined that Plaintiff is probably capable of performing the physical requirements of the job, with certain restrictions.

However, as to those restrictions, I find that DRMS did not evaluate whether Plaintiff could perform her job with those restrictions. Specifically, Dr. Ferrante, DRMS's consulting rheumatologist, opined that Plaintiff could perform fulltime sedentary to light work if she had regular opportunities for positional changes and limitation of repetitive fine motor activity to 15 minutes at a time and 30 minutes in any one hour. Dr. Timms concurred with Dr. Ferrante's assessment. It is unknown from the physical requirements of Plaintiff's job if these restrictions would impact the ability to perform her job. For example, the job requirement indicates that it involves sitting most of the time, with occasional walking and standing. The job also involves numerous functions that may involve fine motor activity, such as writing directives and developing reports on various issues. This would have been a simple question to ask the employer, but this was not done. Accordingly, I find that this is another issue for remand.[8]

---

[8] I also find problematic Defendant's reliance on the surveillance videos to show that Plaintiff can perform her job. While I do not dispute that these videos can appropriately be considered by DRMS, I find that DRMS cannot rely on these videos to conclusively find that Plaintiff is able to perform her job. The ability of a person to do physical tasks depends on how he or she is feeling on a particular date. The fact that Plaintiff was able to do tasks in the surveillance videos may simply mean that she was having a good day that day in connection with her symptoms. Indeed, Dr. Ramos noted that a person who has fibromyalgia would be able to perform the tasks on the video on any given day, but could not perform such tasks eight hors a day, five days a week, as required to perform full time work. The videos cannot be used to refute those medical findings related to Plaintiff's fibromyalgia and the symptoms and impairments that Plaintiff experiences related to same.

Finally, I find error with other findings that DRMS made as a basis to deny Plaintiff's disability application. Specifically, while DRMS did not dispute the fibromyalgia diagnosis, it stated in its denial letter that there was no objective evidence to support a finding that Plaintiff's fibromyalgia was disabling. Rec. at 97-99 ("information reviewed from your treating providers cannot identify any objective basis for your subjective complaints of generalized pain", "[y]our physical exam findings are all within normal limits"). These statements indicate a lack of understanding of a diagnosis of fibromyalgia which is not supportable by law.

Specifically, DRMS failed to consider that objective findings are not necessarily required in connection with such a diagnosis and that there are no clinical tests which support a finding of fibromyalgia or its symptoms. *See Moore v. Barnhart*, 114 Fed. Appx. 983, 991 ("[t]he ALJ recognized plaintiff's diagnosis of fibromyalgia, but seems to require that it be established for a formal clinical or laboratory test. . . . [t]he disease . . . 'is diagnosed entirely on the basis of patients' reports and other symptoms'") (quotation omitted); *Glenn v. Apfel*, 102 F. Supp. 2d 1252, 1254-1255, 1258 (D. Kan. 2000) (noting that courts have recognized that the pain suffered by those with fibromyalgia can be disabling, and that "[t]he symptoms of fibromyalgia are entirely subjective, and there are no clinical tests to identify its presence or severity") (quoting *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996)); *see also Gibert v. Astrue*, 231 Fed. Appx. 778, 783-84 (10th Cir. 2007); *Brown v. Barnhart*, 182 Fed. Appx. 771 (10th Cir. 2006). It was thus error to deny disability benefits based on a lack of clinical tests or findings or other objective evidence. This issue also requires a remand for further factfinding.

Since I am remanding this case for further factfinding, including assessment of Plaintiff's psychological and other impairments that were not properly considered, I find that it is appropriate for Plaintiff to be able to present further relevant evidence in support of these impairments. This includes, but is not limited to, the Psychiatric Evaluation provided to DRMS on March 24, 2004.

V.    CONCLUSION

Based upon the foregoing, it is

ORDERED that Plaintiff's Motion for Judgment on the Pleadings (filed October 11, 2007) is **DENIED**. It is

FURTHER ORDERED that Objection and Motion to Strike Exhibit A to Defendant's Motion for Judgment on the Administrative Record (filed September 24, 2007) is **OVERRULED** and **DENIED**. It is

FURTHER ORDERED that Defendant's Motion for Judgment on the Administrative Record (filed August 2, 2007) is **DENIED**. It is

FURTHER ORDERED that this case is **REMANDED** to the Plan Administrator for further factfinding on Plaintiff's disability opinion in accordance with this Order. It is

FURTHER ORDERED that since this case has been remanded, this case is **DISMISSED WITHOUT PREJUDICE**.

Dated: March 20, 2008

BY THE COURT:

s/ Wiley Y. Daniel
Wiley Y. Daniel
U. S. District Judge